West Midtown Mgt. Group, Inc. v State of N.Y., Dept. of Health, Off. of the Medicaid Inspector Gen. (2018 NY Slip Op 04666)

West Midtown Mgt. Group, Inc. v State of N.Y., Dept. of Health, Off. of the Medicaid Inspector Gen.

2018 NY Slip Op 04666 [31 NY3d 533]

June 26, 2018

Feinman, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 12, 2018

[*1]

West Midtown Management Group, Inc., Doing Business as West Midtown Medical Group, Respondent,
v
State of New York, Department of Health, Office of the Medicaid Inspector General, Appellant.

Argued June 7, 2018; decided June 26, 2018

West Midtown Mgt. Group, Inc. v State of New York, 142 AD3d 843, reversed.

{**31 NY3d at 535} OPINION OF THE COURT

Feinman, J.

The Office of the Medicaid Inspector General (OMIG) notified petitioner, the operator of a methadone clinic and provider of Medicaid-covered services, that it had been overpaid an estimated $1,857,401 in claims from 2003 through 2007. This number was extrapolated after auditing a random sample of claims paid to petitioner. OMIG informed petitioner that it had 20 days to agree to settle these claims for a lower amount—$1,460,914—or OMIG would begin to withhold a percentage of petitioner's payments. Petitioner was also informed that OMIG was prepared to defend its full $1,857,401 estimate at any hearing. Twenty days elapsed without petitioner agreeing to settle, and OMIG commenced withholding. Petitioner also failed to timely commence an administrative appeal in order to challenge the audit findings. Petitioner now seeks to prohibit OMIG from liquidating the full $1,857,401 in overpayments and a declaration that OMIG can collect only $1,460,914—the amount for which petitioner declined to settle. We hold that OMIG may withhold payments to recover the full $1,857,401 assessed following the audit.
I. Statutory and Regulatory Framework
[*2]
The Department of Health (DOH) administers the Medicaid program in New York (see Social Services Law § 363-a; Public Health Law § 201 [1] [v]). OMIG was created as an independent office within the Department of Health in 2006 to be the sole state agency focusing on "prevention, detection and investigation of fraud and abuse within the [Medicaid]{**31 NY3d at 536} program," with the power to refer "appropriate cases for criminal prosecution," and to recover improperly expended Medicaid funds "through a variety of administrative and civil mechanisms" (Senate Introducer's Mem in Support, Bill Jacket, L 2006, ch 442 at 9, 2006 McKinney's Session Laws of NY at 1911). OMIG implements the DOH rules and regulations intended to recover unjustified Medicaid payments (see Public Health Law § 32 [20]). One method of recovery is through on-site audits of providers' records based on statistical samplings (see 18 NYCRR part 517; § 519.18 [g]). An extrapolation of findings based on an audit using a certified valid statistical sampling method is presumed to be an accurate determination of the total overpayments made, "in the absence of expert testimony" or other evidence submitted by the provider at a hearing (id. § 519.18 [g]). Where an audit finds overpayments, OMIG issues a draft audit report identifying those items (id. § 517.5). The draft audit report contains the amount of the overpayment "[w]hen feasible," the proposed action and its legal basis, and provides an opportunity for the provider to object (id. § 517.5 [a], [b]). The failure by the provider to timely object "to the proposed action" may result in "the adoption of the proposed action as the final agency action" (id. § 517.5 [b]).
After consideration of the provider's objections, if any, and any supporting documents and materials, or after passage of 40 days from mailing the draft audit report without receiving objections, OMIG may issue a final audit report (id. § 517.6 [a]). The final audit report "and/or the cover letter accompanying it" must "clearly" advise the provider of: (1) the nature and amount of the audit findings, the basis for the agency's action and its legal authority; (2) the action which will be taken; (3) the effective date of the intended action, which will be not less than 20 days from the date of the final audit report; (4) the right to appeal in an administrative proceeding; and (5) the scope of the hearing which is limited to "issues relating to determinations contained in the final audit report" (id. § 517.6 [b]). A provider has 60 days to request an administrative hearing to challenge the final audit report (see Social Services Law § 145-a [2]; 18 NYCRR 519.7). The request must be in writing (see 18 NYCRR 519.7 [b]). If a hearing is held, the decision becomes "the final agency action and is binding upon the parties" (18 NYCRR 519.22 [c]). If no hearing is requested within the 60-day time period, the final audit report may be docketed with the County Clerk, whereupon it takes on "the full force and effect of a judgment" (Social Services Law § 145-a [2]).
{**31 NY3d at 537}Twenty days after the issuance of the final audit report, and upon five days' prior notice, OMIG may "commence recoupment of overpayments" by withholding all or part of a provider's payments that are otherwise payable (18 NYCRR 518.7 [b]; 518.8 [a]). Importantly, OMIG may begin withholding payments even before the expiration of the 60-day period for the provider to request an administrative hearing, and before the final audit report has become a final administrative determination. Under these circumstances, the withholding may be extended "until an amount reasonably calculated to satisfy the overpayment is withheld, pending a final determination on the matter" (id. § 518.7 [d] [2]).
II. Procedural and Factual Background
Petitioner operates two methadone clinics in Manhattan. It is authorized by the State of New York, Department of Health, Office of Alcohol and Substance Abuse Services to provide outpatient services to chemically dependent patients and to receive payment for those services from Medicaid. By virtue of its enrollment in the Medicaid program as a services provider, its records are subject to audit by OMIG (see 18 NYCRR 504.3 [g], [i]).
In January 2010, after auditing a random sample of claims covering the years 2003 through 2007, OMIG issued a draft audit report concluding that petitioner had received more than $6 million in unjustified Medicaid payments. Petitioner challenged the draft audit report. On June 16, 2010, OMIG issued its final audit report (FAR) and, on the same date, delivered it to petitioner with a cover letter.
The cover letter and accompanying FAR informed petitioner that the "extrapolated point estimate" of its overpayments was $1,857,401. Because OMIG estimates overpayments based on sampling, it cannot determine with certainty how much it is owed across the entire pool of claims. The "extrapolated point estimate" represents just that—an estimate—based on the subset of claims that were audited. Nevertheless, by regulation, OMIG's [*3]extrapolated point estimate would be presumed to be an accurate determination of the total overpayments at any hearing in the absence of expert testimony or evidence to the contrary (see id. § 519.18 [g]).
The cover letter and FAR also informed petitioner that the "lower confidence limit" estimate of overpayments was $1,460,914. As explained in the letter, this meant that there{**31 NY3d at 538} was a 95% chance that the true amount of overpayments across the entire pool of claims was greater than $1,460,914.
The FAR contained a section, entitled "Provider Rights," that explained that petitioner could settle the audit within 20 days from the date of the FAR by "repay[ing] the lower confidence limit amount," i.e. $1,460,914, as a lump sum, or by contacting OMIG to enter into a repayment agreement. Should petitioner fail either to repay the $1,460,914 or timely contact OMIG regarding a repayment plan within 20 days, OMIG would commence withholding payments equal to 50% of petitioner's Medicaid billings to "liquidate the lower confidence limit amount, . . . not barring any other remedy allowed by law" (emphasis added). Notice of withholding would be provided "no later than 5 days after" withholding commenced. The same section also indicated that if petitioner chose "not to settle [the] audit through repayment of the adjusted lower confidence limit," it could challenge OMIG's findings through an administrative hearing "where the OMIG would seek and defend the point estimate of $1,857,401" (emphasis added). Petitioner was advised that it had 60 days from the date of the FAR to request a hearing. The cover letter reiterated that OMIG reserved the right to take additional actions in addition to recovering the overpayments set forth in the report.
With the delivery of the FAR, the 20-day and 60-day limitations periods both began to run. The 20-day period expired on July 6, 2010, without petitioner selecting a settlement option. Accordingly, on July 12, 2010, OMIG issued a "Notice of Withholding" to petitioner indicating that the agency had begun withholding 50% from each of petitioner's payments for current and future claims. The notice stated that petitioner had been "previously informed that an overpayment totaling $1,460,914.00 was identified as a result of the above-referenced audit." The notice further indicated that the withholding was "temporary," and would "continue until such time as the balance due is recovered."
The 60-day deadline to request an administrative hearing expired on August 15, 2010, without petitioner making a written request.[FN1] Thereafter, on December 9, 2010, OMIG issued a second notice of withholding, reflecting that, going forward, a{**31 NY3d at 539} 5% withholding rate would be assessed based on petitioner's request for a hardship reduction. This second notice, like the first notice from July 2010, stated that petitioner had been "previously informed that an overpayment totaling $1,460,914.00 was identified as a result of the above-referenced audit," and otherwise contained the same information as in the first notice.
[*4]
Petitioner alleges that it first learned in September 2013, through a telephone call, that OMIG would seek reimbursement of the entire $1,857,401 identified as the point estimate in the FAR. Its representative protested in an email to OMIG on September 12, 2013, that "it has always been our understanding that the collection of overpayments was based on the lower $1.4 amount," pointing to the December 2010 notice of withholding identifying the "overpayment amount as $1,460,914." Petitioner claimed it had "no record of any correspondence to the contrary."
Petitioner commenced the instant article 78 proceeding seeking to prohibit the agency from withholding more than the lower confidence amount referenced in the December 2010 withholding notice. Supreme Court found no merit to the argument that the withholding notices, which referenced the FAR identification number, established that OMIG had agreed that petitioner's ultimate liability was limited to the lower confidence limit, pointing to the FAR statement that OMIG would seek, by withholding, to recover the balance "not barring any other remedy allowed by law." It found that petitioner was "well aware of its ultimate liability for $1.8 million," as this amount was referenced multiple times in connection with the CPLR article 78 proceeding.
The Appellate Division reversed, with two justices dissenting (see West Midtown Mgt. Group, Inc. v State of New York, 142 AD3d 843 [1st Dept 2016]). The majority reasoned that the December 9, 2010 notice of withholding served as the notice of the duration of withholding as required by 18 NYCRR 518.7 (c){**31 NY3d at 540} (2), and because it plainly referred to "an overpayment totaling $1,460,914" and stated that withholding would continue until "the balance due is recovered," OMIG was not authorized to collect more than that amount (id. at 844-845). We now reverse.
III. Discussion
Petitioner argues that it never received proper notice that OMIG planned to withhold a total of $1,857,401, contending that the FAR failed to "clearly advise" petitioner of OMIG's intent to withhold payments beyond the lower confidence limit estimate of $1,460,914 if petitioner failed to request a hearing (18 NYCRR 517.6 [b]). In addition, because the two notices of withholding delivered in 2010 referenced a "balance due" of $1,460,914, petitioner effectively argues that OMIG "acquiesced" to this lower amount and failed to provide proper notice that it would seek to withhold a greater amount in accordance with section 518.7 (c). For the reasons that follow, we find these arguments unpersuasive.
 Petitioner ignores the clear statements in the June 16, 2010 cover letter to the FAR and in the FAR's executive summary that petitioner's estimated overpayment liability was $1,857,401. The pertinent regulations provide that, if an audit report is challenged, "[a]n extrapolation based upon an audit utilizing a statistical sampling method certified as valid will be presumed, in the absence of expert testimony and evidence to the contrary, to be an accurate determination of the total overpayments made or penalty to be imposed" (id. § 519.18 [g]). By contrast, the $1,460,914 figure, as explained in the FAR and the cover letter, merely represented, with 95% accuracy, a lower bound on the true amount overpaid. The FAR and cover letter sufficiently notified petitioner, in accordance with section 517.6 (b), of OMIG's $1,857,401 overpayment assessment which OMIG would be entitled to withhold in accordance with section 518.7.
Our conclusion is supported by the language contained in the FAR provider rights section. That section stated that, should petitioner fail to settle, OMIG will commence withholding and "liquidate the lower confidence limit amount . . . not barring any other remedy allowed by law" (emphasis added). Likewise, the cover letter stated that "OMIG reserves the right to take additional actions" and indicated that the "audit may be settled through repayment of the lower confidence limit of{**31 NY3d at 541} $1,460,914" (emphasis added). The only logical reading of the provider rights section is as a settlement offer, pursuant to which petitioner had 20 days to either repay the lower confidence limit estimate or agree to a repayment plan. Under petitioner's reading of this section, the 20-day clock for petitioner to accept OMIG's settlement offer would be rendered meaningless, as petitioner could simply allow the 20-day period to elapse without incurring any additional liability. Indeed, under petitioner's reading, the only way for OMIG to recover the full $1,857,401 that it said it was owed would be for petitioner to request, and then lose, an administrative hearing.
[*5]
Contrary to petitioner's contentions, it was reasonable for OMIG to indicate that, should petitioner fail to settle, OMIG would "liquidate the lower confidence limit amount." Because petitioner still had time to challenge the FAR in a hearing even after withholding commenced, OMIG reasonably adopted a conservative approach, pursuant to which withholding would—initially—be based on the $1,460,914 figure. This did not preclude OMIG from subsequently seeking to withhold the full $1,857,401 amount. As noted previously, the FAR and cover letter both clearly indicated that the agency reserved its rights to pursue all available remedies.
Petitioner's argument that the subsequent notices of withholding in 2010 were inadequate under section 518.7 (c) of the regulations is without merit. The regulations do not require the notices to state the total amount that OMIG seeks to withhold (see 18 NYCRR 518.7 [c]). To the extent that OMIG was precluded from withholding more than the lower confidence limit amount because the notices specifically indicated a "balance due" of $1,460,914, petitioner does not dispute that, at the time the petition was filed, OMIG had not yet even liquidated this lower amount. Therefore, at the time the petition was filed, OMIG was not required to provide notice of its intent to withhold more than $1,460,914. OMIG may continue to withhold payments even after it has liquidated the lower confidence limit amount, so long as a new notice of withholding is given before it does so (see id.).
 Finally, to the extent that petitioner suggests that OMIG should be estopped from seeking the full $1,857,401 because the FAR and the withholding notices referred to the lower confidence amount, the argument is both legally and factually devoid of merit. It is well established that, with rare exceptions, estoppel is not available as a remedy to prevent a{**31 NY3d at 542} governmental agency from discharging its statutory duties (see Matter of Schorr v New York City Dept. of Hous. Preserv. & Dev., 10 NY3d 776, 779 [2008]; Matter of Parkview Assoc. v City of New York, 71 NY2d 274, 282 [1988]). We have recognized that estoppel "may be warranted in 'unusual factual situations' to prevent injustice" (Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359, 369-370 [1988]), but we have limited its use against government agencies to all "but the rarest cases" (Matter of New York State Med. Transporters Assn. v Perales, 77 NY2d 126, 130 [1990]). The facts in this case do not call for making an exception to our general rule. It is not one of those rare cases where we have suggested that estoppel would be warranted to prevent an injustice (see E.F.S. Ventures, 71 NY2d at 369-370; Parkview Assoc., 71 NY2d at 282). In any event, petitioner was clearly aware of the audit's findings and referred to the $1,857,401 figure in communications with OMIG and the DOH Board of Adjudication, and in its first article 78 proceeding. Even here, in its article 78 petition, petitioner conceded that OMIG "determined, subject to appeal," that petitioner "had been overpaid $1,857,401.00 for outpatient services." In sum, petitioner was on notice from the outset that OMIG was seeking, and entitled to, the full point estimate. While petitioner seizes on references to the lower confidence limit amount in the FAR provider rights section and subsequent notices of withholding, "those who deal with the government are expected to know the law, and cannot rely on the conduct of government agents" to excuse legal obligations (Matter of New York State Med. Transporters Assn., 77 NY2d at 131).[FN2] IV. Conclusion
For the reasons discussed, the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court reinstated.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Garcia and Wilson concur.
Order reversed, with costs, and judgment of Supreme Court, New York County, reinstated.

Footnotes

Footnote 1:In October 2010, petitioner belatedly sought an administrative hearing. In November 2010, the administrative law judge determined that petitioner's request came too late and that it was without jurisdiction to hold a hearing. Petitioner then brought a CPLR article 78 petition in Supreme Court, New York County to compel a hearing, which was denied for the reasons articulated in the administrative law judge's decision. Significantly, in petitioner's request for a hearing, petitioner acknowledged that it "was the subject of a Final Audit Report . . . that alleges an overpayment in excess of $1.8 million" and that it was being "held to at least a $1.4 million repayment (the low point)" (emphasis added). Likewise, the administrative law judge's written decision specifically noted that OMIG "sought to recover" $1,857,401. Petitioner did not appeal the decision.

Footnote 2:Petitioner's related contention, raised for the first time on this appeal, that the notices of withholding themselves constituted "final determinations" within the meaning of part 519 of the regulations was not preserved for our review.